NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

APRIL ANTHONY VENUTI, et al.

                         Plaintiffs,                   CIVIL NO. 03-700 (GEB)

     v.

CITY OF ELIZABETH, et al.,

                        Defendants.          **MEMORANDUM OPINION**

**BROWN, Chief District Judge**

This matter comes before the Court upon Defendants City of Elizabeth, Elizabeth Police Department, Police Officer Michael Carretto, Police Officer Christopher McMahon, Detective Frank Saltarelli and John Doe's (hereinafter "Defendants") Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) [Docket Entry ##'s 33-36, respectively]. The action was reassigned to the undersigned on August 8, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons discussed below, Defendants' Motions for Summary Judgment are granted as to the federal claims and Plaintiff's Complaint is dismissed as to the remaining state claims.

## I.    BACKGROUND

Plaintiffs April Anthony Venuti, individually and as administrator ad prosequendum for the estate of Mark F. Venuti, deceased, on behalf of the heirs-at-law, and next-of kin of the decedent (hereinafter "Plaintiffs") filed a seven count Complaint on February 14, 2003. Count One of the Complaint alleges multiple causes of action, which includes Title 42, United States

Code, Sections 1983 and 1985 violations, N.J.S.A. 2A:31-1 violations under the Wrongful Death

Act; violations of the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States

Constitution; the New Jersey Constitution, including Article I, Section 1, Paragraph 1, Article I,

Section 5, Paragraph 5, Article I, Section 7, Paragraph 7, Article I, Section 12, Paragraph 12, and

Article I, Section 21, Paragraph 21, and claims under the New Jersey Tort Claims Act, including

negligence, intentional infliction of emotional distress, negligent infliction of emotional distress

and false imprisonment.  The subsequent counts reallege the aforementioned claims in separated

form.  Count Two alleges federal and state constitutional violations of "decedent's civil rights,

privileges and/or immunities secured to him . . ." and that such violations were "committed

negligently, carelessly, recklessly and/or intentionally . . ."  Count Three alleges that the actions

of Defendants resulted in the infliction of negligent and intentional infliction of emotional

distress.  Count Four alleges that Defendants conduct resulted in "criminal, fraudulent, malicious,

and/or willful misconduct . . ."  Count Five alleges that Defendants had a legal duty to "rescue

and/or save" decedent Mark Venuti "from death" and that Defendants "did fail to attempt to

rescue and/or save the decedent from death under circumstances demonstrating a substantial

possibility and/or probability of his rescue or saving from death."  Count Six alleges the false

imprisonment of Plaintiff April Venuti by Defendants City of Elizabeth, Elizabeth Police

Department and Detective Frank Saltarelli.  Count Seven alleges loss of consortium for Plaintiff

April Venuti and states that " . . .prior to February 25, 2001 [the date of Mark Venuti's death],

the plaintiff, April Anthony Venuti, was the lawfully wedded wife of the decedent, Mark F.

Venuti . . ."  (Compl.).

The facts alleged are as follows: Plaintiff April Venuti and decedent Mark F. Venuti were married on April 11, 1992. (Plaintiff's Opposition, p.1). Mark Venuti had "suffered from heroin addiction sporadically over years [including during the marriage] which was affecting his health and well being." (Plaintiff Venuti Affidavit, ¶ 6). Plaintiff April Venuti allegedly informed Mark Venuti that "unless he stopped doing what he was doing I would divorce him to make my point clear." (*Id.*). Plaintiff April Venuti did thereafter divorce Mark Venuti on May 14, 1998. However, Plaintiff April Venuti and Mark Venuti continued to reside together at 819 Canton Street in Elizabeth, New Jersey, an apartment building, after their marriage "as husband and wife." (*Id.*).

After Plaintiff April Venuti divorced Mark Venuti, "he underwent rehabilitative treatment and never again utilized heroin" and that thereafter, they allegedly continued to "love[d] one another quite deeply and would never have parted but for his [Mark Venuti's] death. (*Id.*). We were mutually dependant on one another forever." (*Id.*). Plaintiff April Venuti further alleges that "[A]ll persons in the community where we lived and with whom we associated with considered Mark [Venuti] and I [Plaintiff April Venuti] as husband and wife forever. All hospitals were informed by my Mark that I was his wife, and he considered me to be absolutely his one and only." (*Id.* at ¶ 7).

Prior to the incident in question, decedent Mark Venuti had a medical history which was "significant for anxiety, depression, substance and alcohol abuse." (Plaintiffs' Opposition, Exh. 7, p. 4). Mark Venuti had a criminal history related to said substance abuse. Type of substances abused were "crack" cocaine, heroin and alcohol. (*Id.*). Mark Venuti also had a history of psychiatric issues for which he was hospitalized beginning in 1997 and continuing through

-3-

January 29, 2001, three weeks prior to the incident in question.  On January 29, 2001, while at

the psychiatric emergency room of Trinitas Hospital, Mark Venuti allegedly attempted to strangle

himself with a telephone cord.  (Psychiatric Discharge Summary, Trinitas Hospital dated

February 1, 2001; Defendants City of Elizabeth and Elizabeth Police Department's Motion for

Summary Judgment, p. 1).  At that time, Mark Venuti was admitted for depressive disorder,

polysubstance abuse, and paranoid delusional disorder with suicidal ideation.  Mark Venuti was

found to be non-compliant in taking his psychiatric medications.  (*Id.*)

Also prior to the incident in question, decedent Mark Venuti was allegedly stopped on

multiple occasions by "officers employed by the City and Police Department" without probable

cause and interrogated, searched for drugs, accused of crimes and at one time in 1999 "stripped

searched nude in the street without a warrant . . . in the presence of Plaintiff April Venuti."  Mark

Venuti was also allegedly harassed and "pistol whipped" by officers at an Ikea furniture store

parking lot.  Plaintiff April Venuti allegedly also became a target of the officers as her vehicle

was towed and later destroyed.  (Plaintiffs' Opposition, pp. 4-5).

On February 24, 2001, Plaintiff April Venuti allegedly went to a wedding.  Mark Venuti

stayed in their apartment at 819 Canton Street in Elizabeth, New Jersey.  At approximately 10:00

p.m., Mark Venuti called the police, claiming that "[w]e got an emergency here.  We need

somebody up here quick . . . please."  (Plaintiff's Opposition Brief, Exh. 23, p. 2).  Mark Venuti

thereafter hung up the telephone.  The dispatcher called Mark Venuti back and inquired as to

what the issue was.  Mark Venuti's reply was as follows: "I'm the last one.  I'm waiting.  There's

no problem . . .bye."  Mark Venuti then hung the phone up again.  (*Id.*).

At approximately 10:02 p.m., tenant Paul Korkidias called the police, claiming that Mark Venuti was "banging and crashing" on his door as well as yelling and screaming. At approximately 10:07 p.m., an additional call was received by police from another tenant at 819 Canton Street regarding a disturbance at the apartment complex. (*Id.*).

A police unit was dispatched at approximately 10:06 p.m. (Defendant Carreto Motion for Summary Judgment, Exhibits C, D and F; Plaintiffs' Opposition Brief, Exh. 23, p. 2). Officers Michael Carreto and Christopher McMahon responded to the call. Officer Carreto had graduated from the John H. Stamler Police Academy approximately nine months prior to the incident. (Plaintiffs' Opposition Brief, Exh. 21). Upon arriving, the officers entered the building and began walking up the stairs. They allegedly came across a woman sitting in a vestibule-type area smoking a cigarette. The officers asked the woman if she had called the police. The woman replied negatively, and asked them what apartment were looking for. The officers allegedly replied "A2." The woman then allegedly offered to show the officers the location of the apartment and then proceeded to guide them. (*Id.* at Exh. 24).

Upon arriving at apartment A2, the officers took their positions. Officer McMahon went to the right of the front door of apartment A2, and Officer Carreto stood in front of the door. Officer Carreto then proceeded to knock on the door. Mark Venuti, who was inside the apartment at the time, allegedly asked "who is it?" Both officers then stated "police." Mark Venuti then allegedly started to yell, claiming that he was "armed" and had a dog. (*Id.*).

At that point, both officers allegedly removed their weapons from their holsters. Either during the removal or immediately thereafter, Mark Venuti allegedly flung the door open, and ran towards Officer Carreto, still shouting that he was armed. At that time, Mark Venuti had his arm

over his head with an object in his hand, allegedly obscured from the officers vision by either shadow or Mark Venuti's head (both Officers testified at interviews and depositions taken that although it was nighttime, the hallway was well lit). While allegedly running toward Officer Carreto, Officer Carreto fired a single shot from his police issued firearm. Mark Venuti was hit in the stomach area. (*Id.*; Exh. 17).

Although being shot in the stomach, Mark Venuti allegedly did not fall to the ground, but rather, began shouting to the officers to "shoot [me] in the chest" or "shoot [me] in the heart" and repeated the demand, first turning towards Officer McMahon, then reapproaching Officer Carreto, as well as still holding an object behind his head. Officer Carreto, still not being aware of what the object was, and allegedly still fearing for his safety, fired a second round into Mark Venuti's stomach area. At that point, Mark Venuti allegedly fell to the floor. (*Id.*).

Immediately thereafter, Officer Carreto kept his weapon on Mark Venuti while Officer McMahon went to an open area to radio for help. The first radio transmission from Officer McMahon is allegedly received by police headquarters at approximately 10:14 p.m. Medical assistance allegedly arrives at approximately 10:25 p.m. At approximately 10:36 p.m., Mark Venuti is reported as being in route via ambulance to University Hospital, and at 10:50 p.m., there is a report that Mark Venuti had arrived at University Hospital. (*Id.* at Exh. 17 and 21).

Thereafter, a number of higher ranking officers began arriving at the scene of the shooting. Among the officers to respond to the scene was Detective Frank Saltarelli. While investigating the circumstances of the shooting, at approximately 12:00 a.m., Detective Saltarelli observed a female identified as Plaintiff April Venuti coming through the hallway leading to the apartment. Plaintiff April Venuti identified herself to Detective Saltarelli, who then informed

Plaintiff April Venuti that Mark Venuti was involved "in an altercation with police" (Plaintiffs' Opposition, Exh. 16, p. 39) or that Mark Venuti had "merely hit a police officer."  (Plaintiff's Opposition, Exh. A).

Accounts differ at this point.  Detective Saltarelli states that he brought Plaintiff April Venuti into the apartment and informed her that Mark Venuti had been shot and that he was in critical condition at the hospital.  Detective Saltarelli further states that Plaintiff April Venuti became very upset and "very difficult to deal with."  Detective Saltarelli further states that Plaintiff April Venuti then expressed to him that Mark Venuti had been depressed, that she shouldn't have left him alone, that he wasn't taking his medication and that he had threatened suicide two weeks prior to that.  At that point, Detective Saltarelli states he then expressed to Plaintiff April Venuti his desire to seize certain items in the apartment that he had seen about. Detective Saltarelli additionally states that at that time, Plaintiff April Venuti asked if she could go to the hospital to see Mark Venuti.  Detective Saltarelli indicates that at that point, he reiterated his interest in certain items in the apartment.  Plaintiff April Venuti was then asked whether she would sign a consent form for the items.  Detective Saltarelli told Plaintiff April Venuti that if she did not consent to the seizure of the items, that he would be forced to attempt to obtain a search warrant.  Plaintiff April Venuti responded negatively about the search warrant and then asked what the differences were between a consent and a search warrant.  Detective Saltarelli then stated to Plaintiff April Venuti that " . . . if we could get this consent signed you're free to go and I'll lock up your apartment for you.  I mean, I would have still let her go but it would have been easier.  And I explained that to her.  And after several minutes, she agreed and signed it and off she went."  (Plaintiffs' Opposition, Exh. 16, pp.47-50).

Plaintiff April Venuti asserts, however, that Detective Saltarelli was very confrontational, "threatening me to let me go if I signed consent to search our apartment. I told him repeatedly that I wanted to be with Mark . . . he kept all information and facts from me purposely [regarding the circumstances and Mark Venuti's physical condition] playing head games saying repeatedly that he would get a Judge's Court Order to search the apartment which would take hours to sign and then I could go see Mark at the hospital . . ." (Plaintiffs' Opposition, Exh. A). Because Plaintiff April Venuti wanted to see Mark Venuti at the hospital, she signed the consent form.

Plaintiff April Venuti did not arrive to the hospital in time to see Mark Venuti alive. He passed away at 1:39 a.m. on February 25, 2001, after significant medical efforts, including surgery, were taken by hospital staff to save his life. (*Id.* at Exh. 23, p. 4). The object found in Mark Venuti's hand after he had fallen to the ground was discovered to be a bible. It was medium blue in color, with a red spine, larger than a 5 X 8" index card, but smaller than an 8.5 X 11" piece of paper.

## II.   STANDARD OF REVIEW

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996); *Healy v. New York Like Ins. Co.*, 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no

issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view

the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *See*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pennsylvania*

*Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

      Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond, summary
> judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof

on a claim.  Rather, "the determination of whether a given factual dispute requires submission to

a jury must be guided by the substantive evidentiary standards that apply to the case."  *Anderson*,

477 U.S. at 255-56.

      Under the rule, a movant must be awarded summary judgment on all properly supported

issues identified in its motion, except those for which the non-moving party has provided

evidence to show that a question of material fact remains.  *See Celotex*, 477 U.S. at 324.  Put

another way, once the moving party has properly supported its showing of no triable issue of fact

and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be

"supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its

opponent must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita*, 475 U.S. at 586, n.12; *see also Anderson*, 477 U.S. at 247-48 ("[B]y

its very terms, this standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion . . . the requirement is

that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also*

*Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to

replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit.");

*Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363

(3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not

match, item for item, each piece of evidence proffered by the movant" but rather must exceed the

'mere scintilla' threshold.), *cert. denied*, 507 U.S. 912 (1993).

## III.   DISCUSSION

### A.   <u>Federal Claims Against Defendants City of Elizabeth and Elizabeth Police Department</u>

Plaintiffs assert federal claims against Defendants City of Elizabeth and the Elizabeth

Police Department under § 1983 and § 1985 for the above-claimed federal constitutional

violations.  A municipality may be liable for constitutional violations allegedly committed by its

police officers under § 1983 and § 1985 if Plaintiffs can show that the town and police

department established a policy, practice or custom followed by the police officers which caused

the deprivation of a constitutional right.  *Monell v. Dept. of Social Servs. of New York*, 436 U.S.

658, 691 (1978).  Defendants will not be held liable under a *respondeat superior* theory of

liability, however.  *Monell* at 663.  Moreover, "when a suit against a municipality is based on

§ 1983, the municipality can only be liable when the alleged [action] implements or executes a

-10-

policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996); *see also Monell* at 691.

> A government policy or custom can be established in two ways. Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law.

*Beck* at 971; *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). A custom may also be established by evidence of knowledge of the misconduct and acquiescence in the continuing action. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).

Here, no facts are set forth by Plaintiffs to establish the liability of Defendants City of Elizabeth and the Elizabeth Police Department. Plaintiffs offer nothing to demonstrate a city or police department custom or policy that resulted in a constitutional violation. Three individuals called the Elizabeth Police Department, one of which was Mark Venuti himself, asking the police to come. Two police officers were dispatched to the scene in accordance with the requests for help. The officers went to the apartment in question and knocked on the door. The police officers, responding to Mark Venuti's inquiry as to their identity, identified themselves by stating that they were police officers. Before the police officers took any action whatsoever, Mark Venuti informed them that he was armed, and then rushed out of the apartment toward one of the officers in a threatening manner with an object which was obscured by its positioning. Officer Carreto, the police officer Mark Venuti was approaching then shot Mark Venuti in an apparent effort of self preservation. The policy to dispatch officers to investigate calls for assistance of citizens in the city they are sworn to protect and serve is a general if not universal one. It is not a policy that is designed to inflict injury in and of itself. The policy the police officers in question

followed is simply a policy designed to assist all citizens of the City of Elizabeth.

Further, police officers maintain the right to protect themselves from injury or death when a threat is perceived, and whether or not Officer Carreto exercised an error in judgment by standing in front of the doorway, or choosing to respond to the perceived threat of deadly force with deadly force does not implicate the City of Elizabeth or the Elizabeth Police Department as a single allegation regarding one "particular officer [who] may be unsatisfactorily trained will not alone suffice to fasten liability on the city." City *of Canton v. Harris*, 489 U.S. 378, 379 (1988); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 813, 823-24 (1985) (holding municipal liability based on policy of inadequate training or supervision cannot be derived from single incident of misconduct by municipal employee). To impose liability in such circumstances would place Defendants in a *respondeat superior* position of liability for every action of every city employee. This is clearly disallowed pursuant the Supreme Court's holding in *Monell*.

Further, even if Plaintiffs were to provide some tangible evidence to suggest that an inadequate training policy was in place by the hands of the City of Elizabeth and the Elizabeth Police Department (beyond Plaintiffs' inference that Police Officer Carreto's position in the hallway when Mark Venuti came out of his apartment was incorrect), Plaintiffs would nevertheless have to provide additional evidence demonstrating the policymakers deliberate intent to select an inadequate training program. *Tuttle* at 823.

As such, there are no questions of material facts and Defendants City of Elizabeth and the Elizabeth Police Department are entitled to judgment as a matter of law. All federal claims against Defendants City of Elizabeth and the Elizabeth Police Department shall therefore be dismissed.

**B.**     **Federal Claims Against Defendants Police Officer Michael Carreto, Police
Officer Christopher McMahon, "John Doe" Elizabeth Police Dispatcher, and
"John Doe" Elizabeth Police Officers I-V**

Plaintiffs also assert federal claims against Defendants Police Officer Michael Carreto,

Police Officer Christopher McMahon, "John Doe" Elizabeth Police Dispatcher, and "John Doe"

Elizabeth Police Officers I-V, including § 1983 and § 1985, and the underlying federal

constitutional violations.  "The doctrine of qualified immunity 'hold[s] that government officials

performing discretionary functions generally are shielded from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Doe v. County of Centre, P.A.*, 242 F.3d at 453-54 (3d

Cir. 2001) (quoting *Harlow v. Fitgerald*, 457 U.S. 800, 818 (1982)).  The conduct is measured

under an objective standard of whether his conduct was required as it would be seen by an

ordinary reasonable police officer would view the conduct.  *Id.*

In determining whether a defendant is immune from suit, the Court must determine: i)

whether the plaintiffs alleged a violation of their statutory or constitutional rights; ii) whether the

right alleged to have been violated was clearly established in the existing law at the time of the

violation; and iii) whether a reasonable official should have known that the alleged action

violated the plaintiffs' rights.  *See id.* at 454 (quoting *Rouse v. Plantier*, 182 F.3d 192, 196-97

(3d Cir. 1999)); *see also Michaels v. New Jersey*, 222 F.3d 118, 121 (3d Cir. 2000) (citations

omitted); *Saucier v. Katz*, 533 U.S. 194 (2001) (district court in California denied summary

judgment on issue of excessive force, finding genuine issue of material fact on question of force;

United States Supreme Court overturned, granting summary judgment, holding "[I]f the law did

not put the officer on notice that his conduct would be clearly unlawful, summary judgment

-13-

based on qualified immunity is appropriate.").  The determination of whether a defendant is entitled to a defense of qualified immunity is a question of law for the Court to decide.  *See Michaels*, 222 F.3d at 121 (citation omitted).

Here, Police Officer Carreto perceived the need to utilize deadly force.  That force appears objectively reasonable to both a lay person and to his fellow officers. Of course, the use of force is justifiable in circumstances where the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself.  *See* N.J.S.A. 2C:3-4(a).  Under the circumstances, Police Officers Carreto and McMahon had every reason to believe that Mark Venuti was armed and was attacking them.  First, Mark Venuti indicated very clearly to the police, the very individuals he himself called for help, that he was armed and had a dog.  Then, despite being aware that the police were outside his door, and probably readying themselves based on his assertion, he flung the door open, with an object in his hand which was obscured from view, yelling and running toward one of the officers.  Further, after being shot once, he began shouting to the police officers to "shoot me in the chest, shoot me in the heart" and then again made threatening advances at Officer Carreto as well as Officer McMahon.  Finally, Officer McMahon immediately called for medical assistance for Mark Venuti after he was no longer a threat to either Officer McMahon or Officer Carreto, and medical assistance arrived eleven minutes after the call was made.  The actions of the police were therefore objectively reasonable and are therefore entitled to the protections of qualified immunity.[1]

---

[1]  The Court is mindful that no federal violations were asserted against Defendant Detective Saltarelli.

-14-

C.      **Remaining State Law Claims**

Pursuant to 28 U.S.C. § 1367(c)(3), district courts have discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." The Third Circuit has held that "'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so.'" *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *accord Markowitz v. Northeast Land Co.*, 906 F.2d 100, 106 (3d Cir. 1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court.").

Here, the Court is not persuaded that the above factors weigh in favor of exercising jurisdiction or that the parties will be unduly prejudiced by allowing a state court to address the remaining state law claims. Accordingly, in the interest of judicial economy, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3) and those claims are hereby dismissed for lack of jurisdiction.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment are granted as to the federal claims and Plaintiffs' Complaint is dismissed as to the remaining state claims for lack of jurisdiction.

s/Garrett E. Brown, Jr.
**HONORABLE GARRETT E. BROWN, JR**
**CHIEF UNITED STATES DISTRICT JUDGE**

Dated: October 3rd, 2006

-15-